**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| NINGDE AMPEREX TECHNOLOGY LIMITED, | |
| *Plaintiff*, | |
| v. | Case No. 2:24-CV-00728-JRG |
| ZHUHAI COSMX BATTERY CO., LTD., | **Jury Trial Demanded** |
| *Defendant.* | |

## PLAINTIFF NINGDE AMPEREX TECHNOLOGY LIMITED'S OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................1

II.     LEGAL STANDARDS ......................................................................................2

        A.      Claim Construction ...............................................................................2

        B.      Indefiniteness ........................................................................................2

III.    DISPUTED CLAIM TERMS.............................................................................4

        A.      "a weight percentage of the dinitrile compound is X"/"a weight percentage
                of the trinitrile compound is Y" ('910 Patent: Claims 1, 4, 6, 12, 18-20, 22-
                25; '131 Patent: Claims 1, 7, 14) ..........................................................4

        B.      "only a single-sided coating or a double-sided coating present on the same
                electrode" ('910 Patent: Claim 14) ........................................................8

        C.      "wherein the electrode comprises an anode" ('910 Patent: Claim 15) ..................13

        D.      "the pores at least comprises a part of the inorganic particles" (Patent '148:
                Claims 1, 10) .........................................................................................16

        E.      "a first layer comprising a first material" ('118 Patent: Claims 1-4, 6-7, 10,
                12-13, 15, 16, 19, 20) ...........................................................................20

        F.      "a second layer comprising a second material" ('118 Patent: Claims 1, 3, 6,
                8, 10, 12, 15, 17, 19, 20) ......................................................................26

CONCLUSION.......................................................................................................27

# TABLE OF AUTHORITIES

**Page**

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013)............................................................24

*AstraZeneca AB v. Mylan Pharmaceuticals, Inc.*,
  No. 1:22-cv-35, 2022 WL 17178691 (N.D. W.Va. Nov. 23, 2022) ......................25

*Avid Technology, Inc. v. Harmonic, Inc.*,
  812 F.3d 1040 (Fed. Cir. 2016)......................................................23, 24

*Cadence Pharmaceuticals Inc. v. Exela Pharmsci Inc.*,
  780 F.3d 1364 (Fed. Cir. 2015)..........................................................23

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002)............................................................3

*CDN Innovations, LLC v. Grande Communications Network, LLC*,
  2021 WL 3615908 (E.D. Tex. Aug. 13, 2021) ............................................22

*Dyfan, LLC v. Target Corporation*,
  28 F.4th 1360 (Fed. Cir. 2022) ...........................................................3

*E-pass Technologies, Inc. v. 3Com Corp.*,
  343 F.3d 1364 (Fed. Cir. 2003)..........................................................21

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
  161 F. Supp. 3d 438 (E.D. Tex. 2015)..................................................4, 5

*Estech Systems IP, LLC v. Carvana LLC*,
  No. 2:21-cv-00482-JRG-RSP, 2023 WL 3681720 (E.D. Tex. Jan. 27, 2023)
  ..................................................................2, 21, 22, 23, 24

*Heron Therapeutics, Inc. v. Azurity Pharm. Inc.*,
  No. 24-1363 (WCB), 2025 WL 3022166 (D. Del. Oct. 29, 2025) ....................25, 26

*Huawei Techs. Co. v. T-Mobile US, Inc., No. 216CV00052JRGRSP*,
  2017 WL 1376436 (E.D. Tex. Apr. 15, 2017)............................................13

*Linear Tech. Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004)........................................................3, 9

*Maxell Ltd. v. Huawei Device USA Inc.*,
  297 F. Supp. 3d 668 (E.D. Tex. 2018) ............................................................................8, 16

*Microlinc, LLC v. Intel Corp.*,
  No. 2:07-CV-488, 2013 WL 2471551 (E.D. Tex. June 7, 2013) .......................................9, 10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ...........................................................................................................3

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed.Cir. 2005) ..........................................................................................25

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) .........................................................................................22

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) .........................................................................................25

*Peer Communications Corp. v. Skype Technologies SA*,
  No. 6:06-cv-00370, 2008 WL 4831001 (E.D. Tex. May 29, 2008) ...................................21

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...........................................................................................2

*Seagen Inc. v. Daiichi Sankyo Co.*,
  No. 2:20-CV-00337-JRG, 2021 WL 4168660 (E.D. Tex. Sept. 14, 2021) ...........................4

*Spreadsheet Automation Corp. v. Microsoft Corp.*,
  No. 2:05-cv-00127-DF, 2006 WL 6143063 (E.D. Tex. Nov. 9, 2006) ................................24

*Thorner v. Sony Computer Entertainment America LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ...........................................................................2, 21, 22, 23

*Uniloc 2017 LLC v. Samsung Elecs. Am., Inc.*,
  No. 2:18-CV-00506-JRG, 2020 WL 248880 (E.D. Tex. Jan. 16, 2020) ...............................3

*Zhuhai CosMX Battery Co. Ltd. v. Ningde Amperex Technology Ltd.*,
  IPR2025-00432 ..................................................................................................................20

## Rules/Statutes

35 U.S.C. § 112(b) ..................................................................................................................17

35 U.S.C. § 112, ¶ 2 .................................................................................................................2

35 U.S.C. § 112 ¶ 6 ..................................................................................................................3

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit A | U.S. Patent No. 11,769,910, referred to herein as "'910" or "'910 patent" |
| Exhibit B | U.S. Patent No. 11,799,131, referred to herein as "'131" or "'131 patent" |
| Exhibit C | U.S. Patent No. 11,575,148, referred to herein as "'148" or "'148 patent" |
| Exhibit D | U.S. Patent No. 12,015,118, referred to herein as "'118" or "'118 patent" |
| Exhibit E | Declaration of Dr. Quinn Horn In Support Of ATL's Opening Brief |
| Exhibit F | Excerpt from Petition from *Zhuhai CosMX Co. Ltd. v. Ningde Amperex Technology Ltd.*, IPR2025-00405, Paper 1 (PTAB, Jan. 3, 2025) |
| Exhibit G | Excerpt from Petition from *Zhuhai CosMX Battery Co. Ltd. v. Ningde Amperex Technology Ltd.*, IPR2025-00432, Paper 2 (PTAB, Jan. 10, 2025) |
| Exhibit H | Excerpt from Patent Owner's Discretionary Denial Briefing from *Zhuhai CosMX Battery Co. Ltd. v. Ningde Amperex Technology Ltd.*, IPR2025-00524, Paper 7 (PTAB, Jul. 07, 2025) |
| Exhibit I | Excerpt from Patent Owner Preliminary Response from *Zhuhai CosMX Battery Co. Ltd. v. Ningde Amperex Technology Ltd.*, IPR2025-00524, Paper 9 (PTAB, Aug. 05, 2025) |
| Exhibit J | Excerpt from U.S. Patent No. 10,693,181 |
| Exhibit K | Excerpt from U.S. Patent No. 11,322,774 |

# I.    **INTRODUCTION**

Pursuant to P.R. 4-5(a) and the Docket Control Order entered in this case (Dkt. 27), Plaintiff Ningde Amperex Technology Ltd. ("ATL") respectfully submits this opening claim construction brief regarding six disputed terms: (1) one term shared between the related '910 and '131 patents, (2) two terms for the '910 patent only, (3) one disputed term for the '148 patent, and (4) two disputed terms for the '118 patents. ATL asserts two other patents against Defendant Zhuhai CosMX Battery Co., Ltd. ("CosMX") but the parties agree that there are no disputed terms for these patents.

The parties' proposals reflect fundamentally different approaches to claim construction. As an initial matter, CosMX alleges that three of the six disputed terms are indefinite yet has failed to identify any extrinsic evidence or expert declaration to support its assertion. In contrast, ATL has submitted, in support of its claim construction briefing regarding these terms, the expert declaration of Dr. Quinn Horn who provides his testimony regarding why the terms at issue provide sufficient written description and show why CosMX cannot overcome the high hurdle of clear and convincing evidence to prove indefiniteness as to any claim limitation. Although not controlling, this Court has found it relevant that the question of indefiniteness often turns based on the perspective of one of ordinary skill in the art. Given ATL's unrebutted expert testimony, CosMX's indefiniteness arguments are a dead letter as they are supported by nothing other than attorney argument—CosMX having elected not to present any expert testimony or even to examine ATL's expert at deposition.

For the remaining constructions, CosMX proposes constructions that contradict the plain meaning, the surrounding claim language, and the rest of the intrinsic evidence. CosMX also seeks

1

other rulings that would interpret the claims in ways that are contrary to law. Thus, for the reasons above, CosMX's proposals should be rejected, and ATL's Proposals adopted.

## II. LEGAL STANDARDS

### A. Claim Construction

The words of a patent claim are generally given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," when read and understood in the context of the claims, the entire specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "There are only two exceptions to the general rule that claim terms are construed according to their plain and ordinary meaning: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Estech Systems IP, LLC v. Carvana LLC*, No. 2:21-cv-00482-JRG-RSP, 2023 WL 3681720, at *4 (E.D. Tex. Jan. 27, 2023) (internal quotations and alterations omitted) (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

In determining whether construction is necessary and, if so, what the proper construction should be, both intrinsic and extrinsic evidence may be considered. *Phillips*, 415 F.3d at 1317. Intrinsic evidence includes the patent, the prosecution history of the patent, and prior art incorporated by reference in a patent. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*.

### B. Indefiniteness

Claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2. "[A] patent is invalid for indefiniteness

if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901-02 (2014). "[T]he definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application…." *Id.* at 911. Thus, unless the failure to adequately define claim scope is obvious, expert testimony is important.

In addition, because the indefiniteness inquiry—like the means-plus-function inquiry under 35 U.S.C. § 112 ¶ 6—"turns on the understanding of a person of ordinary skill in the art, we often look to extrinsic evidence when determining whether a disputed limitation would" inform, with reasonable certainty, those skilled in the art about the scope of the invention. *See Dyfan, LLC v. Target Corporation*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (applying 35 U.S.C. § 112 ¶ 6); *see also Linear Tech. Corp. v. Impala Linear Corp.,* 379 F.3d 1311, 1320 (Fed. Cir. 2004) (noting that when considering a limitation under 35 U.S.C. § 112 ¶ 6, expert witness testimony and technical dictionaries "help determine whether a claim term" would have had an "understood meaning in the art") (quoting *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1369 (Fed. Cir. 2002)). Indefiniteness is a challenge to the validity of a patent and "must be shown by clear and convincing evidence." *See Uniloc 2017 LLC v. Samsung Elecs. Am., Inc.,* No. 2:18-CV-00506-JRG, 2020 WL 248880, at *3 (E.D. Tex. Jan. 16, 2020). A district court must credit unrebutted expert testimony regarding how a person of ordinary skill would have understood the allegedly indefinite limitations. *Dyfan, LLC v. Target Corporation*, *supra*, 28 F.4th at 1367 ("[T]he district court erred by ignoring key evidence—unrebutted deposition testimony from Target's own expert, Dr. Goldberg—regarding how a person of ordinary skill would have understood the 'code'/'application' limitations."). Failure to credit such testimony may lead to reversible error. *Id*. at 1368 ("Dr. Goldberg's [unrebutted] testimony thus demonstrates that, contrary to the district

court's unsupported assertion, the claim limitations do not recite 'purely functional language.'"). And although unrebutted expert testimony is not controlling for indefiniteness analysis, this Court has found unrebutted testimony to be at least "relevant" in helping the court determine how one of ordinary skill in the art would interpret an allegedly indefinite term. *Seagen Inc. v. Daiichi Sankyo Co.*, No. 2:20-CV-00337-JRG, 2021 WL 4168660, at *14 (E.D. Tex. Sept. 14, 2021)

### III. DISPUTED CLAIM TERMS

#### A. "a weight percentage of the dinitrile compound is X"/"a weight percentage of the trinitrile compound is Y" ('910 Patent: Claims 1, 4, 6, 12, 18-20, 22-25; '131 Patent: Claims 1, 7, 14)

| **ATL:** Plain and ordinary meaning. | **CosMX:** "a weight percentage of all dinitrile compounds present in the electrolyte is X"/"a weight percentage of all trinitrile compounds present in the electrolyte is Y" |
| --- | --- |

ATL proposes that this term should be granted its plain and ordinary meaning as defined by the '910 patent, meaning that the weight percentage of X or Y is measured based solely on the specific dinitrile or trinitrile compounds *enumerated* in the claims (*i.e.*, the various Markush groups of the '910 and '131 patent claims) as a percentage of the total weight of the electrolyte; the weight percentage of X or Y does not include other dinitrile or trinitrile compounds that may nonetheless be present in the electrolyte . Contrastingly, CosMX proposes an improper construction that the term should include "all dinitrile compounds" present in the electrolyte, regardless of whether they are included in the Markush groups recited in the two patents. Because this construction contradicts the plain language of the claim, it must be rejected.

CosMX's proposal is inconsistent with the language of the claim and specification as written in the '131 and '910 patents. "To determine the meaning of the claims, courts start by considering the intrinsic evidence. The intrinsic evidence includes the claims themselves, the

specification, and the prosecution history." *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd*., 161 F. Supp. 3d 438, 443–44 (E.D. Tex. 2015) (citations omitted). The language used in the claim itself is particularly important, as the "claim construction inquiry ... begins and ends in all cases with the actual words of the claim." *Id.* at 444 (citations omitted). Here, the claim language itself is dispositive.

### 1.    '910 Patent

For the '910 patent, a simple reading of claim 1 renders CosMX's construction incorrect. Claim 1 of the '910 patent states, in its relevant portions:

> [a]electrolyte, comprising a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on a total weight of the electrolyte, **a weight percentage of the dinitrile compound is X**, **a weight percentage of the trinitrile compound is Y** and a weight percentage of the propyl propionate is Z… wherein **the dinitrile compound is one or more compounds selected from the group consisting of butanedinitrile, adiponitrile, ethylene glycol bis(2-cyanoethyl) ether, and 1,4-dicyano-2-butene**; and **the trinitrile compound is one or more compounds selected from the group consisting of 1,3,6-hexanetricarbonitrile, 1,2,6-hexanetricarbonitrile and 1,2,3-tris(2-cyanoethoxy)propane**.[1]

As the parties have agreed, the Markush groups recited in the '910 patent (and the '131 patent) as reproduced above are closed, meaning that "**the** dinitrile compound" and "**the** trinitrile compound" can only "consist of only the named compounds and no others." Dkt. 82 at p. 2. Based on that agreed definition, the parties interpret claim 1 of the '910 patent to necessarily limit the identities of "**the** dinitrile compound" to be the dinitrile compounds listed in the respective Markush groups (*i.e.,* butanedinitrile, adiponitrile, ethylene glycol bis(2-cyanoethyl) ether, and 1,4-dicyano-2-butene) and similarly limit the identities of "**the** trinitrile compound" to be the trinitrile compounds listed in the same claim (*i.e.,* 1,3,6-hexanetricarbonitrile, 1,2,6-hexanetricarbonitrile and 1,2,3-tris(2-cyanoethoxy)propane). Thus, when claim 1 also recites that "a weight percentage of **the**

---

[1] Unless otherwise indicated, all emphasis in citations to the patents-at-issue has been added for demonstrative purposes and is not present in the original patents.

dinitrile compound is X" and "a weight percentage of **the** trinitrile compound is Y" the claim must also inherently limit the calculation of weight percentages of each of the dinitrile and trinitrile compounds to the ones listed in each Markush group respectively.

Even in the absence of such clear and unambiguous claim language, ATL's proposed construction is further supported by the specification. Indeed, as shown in all the tables in the '910 patent, the only dinitriles used in the listed test results fall within the claimed Markush groups. *See* '910 Patent at 25:10-46 (listing dinitrile compounds $A_1$-$A_4$ as SN (succinonitrile which has the same chemical formulation as butanedinitrile), ADN (adiponitrile), EDN (ethylene glycol bis(2-cyanoethyl) ether), and DCB (1,4-dicyano-2-butene)). And although the tables of the '910 patent list additional trinitrile compounds that are not within the Markush group, the specification makes clear that when Y is calculated using only the weight percentage of the trinitrile compounds that are listed in the Markush groups, there are markedly noticeable improvements in battery capacity. For example, the specification discloses that, when a Markush group trinitrile (*i.e.,* $B_1$, $B_2$, or $B_4$) is used as the weight percentage calculation for Y, "the [beneficial] effect of inhibiting the increase in DC internal resistance can also be achieved." '910 Patent at 28:49-60. Based on this disclosure, a POSITA would have known that the calculation of the weight percentage for X and Y as described in claim 1 of the '910 patent is based solely on the named Markush groups for the dinitriles and trinitriles.

## 2. '131 Patent

Many of the arguments presented above for the '910 patent also apply for the '131 patent, where the claim language is equally clear and unambiguous and, thus, controlling. For instance, claim 1 of the '131 patent limits the identity of the trinitriles to a Markush group:

> …wherein the trinitrile compound is one selected from the group consisting of 1,3,5-pentanetricarbonitrile; 1,2,3-propanetrinitrile; 1,3,6-hexanetricarbonitrile; 1,2,6-hexanetricarbonitrile; 1,2,3-tris(2-cyanoethoxy)propane; 1,2,4-tris(2-

cyanoethoxy)butane;        1,1,1-tris(cyanoethoxymethylene)ethane;        1,1,1-tris(cyanoethoxymethylene)propane;        3-methyl-1,3,5-tris(cyanoethoxy)pentane; 1,2,7-tris(cyanoethoxy)heptane;        1,2,6-tris(cyanoethoxy)hexane;        1,2,5-tris(cyanoethoxy)pentane; and any combination thereof.

Claim 5 of the '131 Patent further limits the identity of the dinitriles to another Markush group.

…wherein the dinitrile compound is one selected from the group consisting of butanedinitrile,      glutaronitrile,      adiponitrile,      1,5-dicyanopentane,      1,6-dicyanohexane, 1,7-dicyanoheptane, 1,8-dicyanooctane, 1,9-dicyanononane, 1,10-dicyanodecane,      1,12-dicyanododecane,      tetramethylbutanedinitrile,      2-methylglutaronitrile, 2,4-dimethylglutaronitrile, 2,2,4,4-tetramethylglutaronitrile, 1,4-dicyanopentane, 2,6-dicyanoheptane, 2,7-dicyanooctane, 2,8-dicyanononane, 1,6-dicyanodecane,      1,2-dicyanobenzene,      1,3-dicyanobenzene,      1,4-dicyanobenzene, 3,5-dioxa-pimelonitrile, 1,4-bis(cyanoethoxy)butane, ethylene glycol bis(2-cyanoethyl)ether, diethylene glycol bis(2-cyanoethyl)ether, triethylene glycol bis(2-cyanoethyl)ether, tetraethylene glycol bis(2-cyanoethyl)ether, 3,6,9,12,15,18-hexaoxaeicosanoic dinitrile, 1,3-bis(2-cyanoethoxy)propane, 1,4-bis(2-cyanoethoxy)butane, 1,5-bis(2-cyanoethoxy)pentane, ethylene glycol bis(4-cyanobutyl)ether,    1,4-dicyano-2-butene,    1,4-dicyano-2-methyl-2-butene,    1,4-dicyano-2-ethyl-2-butene,    1,4-dicyano-2,3-dimethyl-2-butene,    1,4-dicyano-2,3-diethyl-2-butene,    1,6-dicyano-3-hexene,    1,6-dicyano-2-methyl-3-hexene,    1,6-dicyano-2-methyl-5-methyl-3-hexene, and any combination thereof.

In addition, Table 1-2 of the '131 patent provides the same comparison between the same dinitrile and trinitrile groups as described above for the '910 patent. *See* '131 Patent at Table 1-2. The only difference between the disclosure of Table 1-2 in the '131 Patent and the same table in the '910 Patent is that, because the Markush group as recited for the trinitriles is broader in claim 1 of the '131 patent than the '910 patent, every trinitrile listed in Table 1-2 is named in the Markush group recited in claim 1 of the '131 patent. However, the fact that every compound used in the calculation of X and Y in every table presented in the '131 Patent should signify even greater support for a POSITA's read that X and Y, as defined in the various claims of the '131 Patent, should include only the compounds named in the Markush groups as defined in claims 1 and 5 of the '131 patent.[2]

---

[2]      To the extent CosMX argues that claim 1 of the '131 patent is differentiated from claim 1 of the '910 patent because claim 1 of the '131 patent does not limit the identity of the dinitrile compounds, ATL agrees. The weight percentage of X in claim 1 of the '131 patent is measured based on all of the dinitriles in the electrolyte as a percentage of the total weight of the electrolyte.

For the reasons above, ATL proposes that the disputed term should be awarded its plain and ordinary meaning.

**B.    "only a single-sided coating or a double-sided coating present on the same electrode" ('910 Patent: Claim 14)**

| **ATL:** plain and ordinary meaning; judicially corrected to "only a single-sided coating or a double-sided coating **is** present on the same electrode" | **CosMX:** indefinite |
|---|---|

CosMX has informed ATL it agrees with ATL's proposed judicial construction. Judicial correction is appropriate here because "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Maxell Ltd. v. Huawei Device USA Inc*., 297 F. Supp. 3d 668, 689 (E.D. Tex. 2018). It is clear from this term that a verb is missing to characterize the presence of the single-sided or double-sided coatings and such a grammatical error is not subject to reasonable debate in light of the claim language and specification. Further, this error seems to have been native to the original patent application and given the lack of discussion of this error between applicants and the examiner in the prosecution history, there is no evidence that either the applicant or the Patent Office intended for a different interpretation of this term.

CosMX nevertheless continues to assert this term is indefinite but has neither provided an explanation in its joint claim construction statement as to why it holds this position nor identified any extrinsic evidence to support its position. The only argument CosMX has presented is in its First Amended Invalidity Contentions, in which it states:

> This claim is indefinite for lacking antecedent basis and invalid for failure to satisfy § 112(d). Claim 14 depends from claim 13 and extends to embodiments according to claim 13 where only a single-sided coating or a double-sided coating is present on the same electrode. However, claim 13 is limited to embodiments with only a

> single electrode. There is no second electrode to support the limitation "only a single-sided coating or a double-sided coating present [sic] on the same electrode." Moreover, claim 14 purports to encompass electrodes that either (1) have the single and double sided coating on the same electrode, or (2) have the single and double sided coating on separate electrodes. First, claim 14 purports to be broader than claim 13 by claiming embodiments with multiple electrodes. Moreover, claim 14 encompasses the universe of single- and double- sided electrode coating combinations and does not further limit claim 13.

Dkt. 64-2 at p. 35. The claim language, as corrected, is clear and unambiguous on its face and CosMX has provided no expert testimony or additional extrinsic support for its position. CosMX's lack of evidentiary support renders its argument a dead letter as it cannot point to what the understanding of a person of ordinary skill in the art would be in support of its proposed construction for this limitation. *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("[B]ecause this inquiry [of indefiniteness] turns on the understanding of a person of ordinary skill in the art, *we often look to extrinsic evidence* when determining whether a disputed limitation would have connoted structure to a person of ordinary skill") (emphasis added).

CosMX's assertions in its First Amended Invalidity Contentions that claim 13 of the '910 patent is limited to embodiments in which there is only one electrode is plainly incorrect as it ignores the plural nature of the antecedent basis for "the electrode." Claim 13 depends on claim 12, which recites: "[a]n electrochemical device wherein the electrochemical device comprises electrode**s**…." Claim 13 then further specifies that "according to claim 12, wherein the electrode comprises a cathode." A POSITA reading claim 13 in light of claim 12 would realize that claim 13 speaks to one of the many possible electrodes that may exist in the configuration as taught by claim 12. *See* Ex. E (Decl. of Q. Horn) at ¶¶ 36-45. Thus, the term "**a** cathode" in Claim 13 means "one or more" cathodes, or equivalently, "at least one" cathode. *See Microlinc, LLC v. Intel Corp.*,

No. 2:07-CV-488, 2013 WL 2471551, at *7 (E.D. Tex. June 7, 2013) ("It is well established that 'a' is generally understood to mean 'one or more.'")

This reading also makes good sense because there are at least two types of lithium-ion batteries discussed in the '910 patent: wound-type cells and laminated-type cells. '910 Patent at 21:4-16. As Dr. Horn explains, wound-type cells are generally considered to have only two electrodes[3] (an anode and a cathode which are wound together into a roll, as depicted below with the brown denoting the copper anode and the silver denoting the aluminum cathodes). Ex. E at ¶¶ 38-39.



Wound-Type Cell

In the context of a wound-type cell, a POSITA would understand that claim 13 may read on a wound-type cell in which the at least one cathode (which may be the only cathode) may have one part of the electrode covered in a single-sided coating and another part of the electrode covered in a double-sided coating. *Id.* at ¶ 40; *see also* '910 Patent at claim 13 ("***a first part*** of the current collector is provided with the ***single-sided coating*** and ***a second part*** of the current collector is

---

[3] Although the general understanding is that wound-type batteries have two electrodes, it is possible for a wound-type battery to also have multiple electrodes in specific contexts and designs.

provided with the ***double-sided coating***). This is consistent with the teachings of the specification, which discloses: "The electrode includes a current collector and a coating on the current collector. ***The coating includes a single-sided coating, a double-sided coating, or a combination thereof***." '910 Patent at 20:47-50. This reading is further supported by language from claim 14 (which CosMX does not contend is indefinite), which recites: "both the single-sided coating and the double-sided coating ***are present on the same electrode***." *Id.* at claim 14.

In the context of a laminated battery, a POSITA would understand that claims 12 through 14, as Dr. Horn opines, read on batteries that may have multiple pairs of cathodes and anodes. As seen in the demonstrative image below, a laminated cell may have multiple cathodes and multiple anodes. *See* Ex. E at ¶¶ 38, 42-45.

In a laminated cell design, multiple cathodes and anodes are stacked on top of each other with a separator in between. *Id.* at ¶ 42. Therefore, a POSITA would understand that a laminated battery may have multiple cathodes and multiple anodes present in each electrochemical device. *Id.* In such a configuration, a POSITA would understand that any one of the several electrodes could have a single-sided coating, a double-sided coating, or both. *Id.* The '910 patent further teaches

that wound-type and laminated cell designs may even be used in combination with one another in a battery, such that the electrodes may comprise features of both types of batteries, such as when "the wound and laminated electrodes are assembled in combination, the cathode and anode generally comprise ***an elongated electrode having both a single-sided coating and a double-sided coating, and a [sic] shaped electrode having only a single-sided coating or a double-sided coating***." *Id.* at 21:11-16. The written description of the '910 patent provides an exemplary embodiment consistent with the plaint meaning of the disputed language of claim 14: "[i]n a laminated electrochemical device, the cathode and the anode are usually formed by laminating shaped electrodes, and ***there is only a single-sided coating or a double-sided coating on the same electrode***." '910 Patent at 21:07-11.

Based on the above descriptions in the '910 specification and on the knowledge of a POSITA, the meaning of the disputed language of claim 14 is clear. First, claim 13 reads on an embodiment where, no matter how many cathodes are present, some portion of the combination of current collectors must have a single-sided coating and some portion must have a double-sided coating—but these coatings do not have to (but may) be on "the same electrode" Accordingly, claim 13 may read on both wound-type and laminated cells (or a combination thereof) of almost any configuration. Claim 14, by contrast, is directed to a narrower class of battery cells with multiple electrodes where each electrode has "both the single-sided coating and double-sided coating [] present on the same electrode" or "only a single-sided coating or a double-sided coating [] present on the same electrode." Claim 14, therefore, would not read on a traditional wound-type battery cell with only one cathode.

For the reasons above, ATL proposes that the disputed term is definite and should be awarded its plain and ordinary meaning with the judicial correction applied.

### C.    "wherein the electrode comprises an anode" ('910 Patent: Claim 15)

| **ATL:** plain and ordinary meaning; judicially corrected to depend from claim 12, not claim 13 | **CosMX:** indefinite |
|---|---|

ATL proposes that this limitation is definite and should be given its plain and ordinary meaning with one judicial correction: claim 15's dependence should be corrected such that the claim refers to claim 12 and not claim 13. Judicial correction is appropriate because it is the only interpretation that would make sense from the perspective of a POSITA, is clear from the face of the patent, and is not subject to reasonable debate. *See, e.g., Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 216CV00052JRGRSP, 2017 WL 1376436, at *11 (E.D. Tex. Apr. 15, 2017) ("The Court agrees that the claim does not make sense as written. The Court further agrees that the claim language should either be corrected or found invalid. The general rule regarding correcting claim language is that '[t]he district court can correct an error only if the error is evident from the face of the patent.'") (citations omitted).

As Dr. Horn explains in his declaration, it would have been obvious to a POSITA that claim 15 cannot be referring to the same electrode as claim 13. Ex. E at ¶ 50. This is because claim 13 describes "the properties of one of the electrodes in the device, the cathode" whereas claim 15 describes the "properties of a different electrode in the device, the anode." *Id.* In the context of the '910 patent, a POSITA would understand that these two electrodes must have different properties and therefore be different electrodes. *Id.* One piece of evidence for this interpretation—as CosMX itself admits in its invalidity contentions—is that the '910 patent ascribes two completely different compaction density ranges for the cathode and anode. Dkt. 64-2 at p. 35 ("Moveover [*sic*], the range claimed for 'D2' in claim 13 is 3.5 $g/cm^3$ – 4.3 $g/cm^3$, whereas the range claimed for 'D2' in claim 15 is 1.2 $g/cm^3$ – 1.8 $g/cm^3$. Claim 15's claimed range falls wholly outside of claim 13's

claimed range."); *see also* '910 Patent at 22:1-10 (describing the same compaction density ranges for the cathode and the anode respectively).

Another key piece of evidence that these electrodes must be different is the fact that the specification teaches that the anode and the cathode are made using different materials and different methods. *See* '910 Patent 19:40-20:41 (describing different materials and construction methods for the anode and the cathode); *see also* Ex. E at ¶ 50 ("In addition, the '910 Patent specification describes the anode and cathode as two different electrodes. The '910 Patent specification provides an example where the anode is described to consist of a mixture of graphite, conductive carbon black, styrene-butadiene rubber, and sodium carboxymethyl cellulose coated on copper foil, and the cathode is described to consist of a mixture of lithium cobalt oxide, conductive carbon black, and polyvinylidene fluoride coated on aluminum foil.")

Considering the above description in the '910 patent's specification, a POSITA would have realized that claim 15 and claim 13 were meant to be sister terms, in the sense that claim 13 described the compaction density range as described in the specification for the cathode while claim 15 described the compaction density range as described in the specification for the anode. And as claim 13 depends on claim 12, a POSITA would have recognized that claim 15 must also depend on the same claim. This is entirely consistent with a POSITA's reading of claim 12 which, as described above, recites an electrochemical device with at least one cathode and one anode. *See supra*, Section III.C.

As further evidence for judicial correction, nothing in the prosecution history suggests a different read. Indeed, the disputed term as written was not subject to any discussion in the course of the prosecution history of the '910 Patent, and there is no evidence that the applicant or the Patent Office intended to construe this term in an alternative manner, but rather that the error in

14

the term was simply a typo that was overlooked by both the applicant and the examiner. *Id.* ("[N]othing in the prosecution history suggests a different interpretation of the claims. The prosecution history consistently contains "is error" throughout the prosecution. Finally, there is no evidence before the Court of culpability or intent to deceive by delaying formal correction.") Finally, even in its IPR against the '910 patent, CosMX's petition assumes that claim 15 applies to an anode which meets the limitations as taught and further meets the requirements of claim 12. CosMX failed to provide any argument or alternative construction in which the teachings of claim 15 would apply to the cathode of claim 13. Ex. E at ¶ 51; Ex. F (CosMX's Petition from IPR2025-00405 at pp. 37-42).

CosMX opposes ATL's judicial correction, and alleges this limitation is indefinite. Here again, CosMX has neither provided an explanation in its joint claim construction statement as to why it holds this position nor identified any extrinsic evidence to support its position.  The only statement ATL can find from CosMX is found again in CosMX' First Amended Invalidity Contentions which states:

> This claim is indefinite for lacking antecedent basis and invalid for failure to satisfy § 112(d). Claim 15 depends from claim 13. Claim 13 specifies a single electrode "wherein the electrode comprises a cathode." Claim 13 does not provide any antecedent basis for claim 15's "anode." Moveover [*sic*], the range claimed for "D2" in claim 13 is 3.5 g/cm3 – 4.3 g/cm3 , whereas the range claimed for "D2" in claim 15 is 1.2 g/cm3 – 1.8 g/cm3 . Claim 15's claimed range falls wholly outside of claim 13's claimed range. Embodiments purportedly falling within the scope of claim 15 are therefore mutually exclusive with embodiments falling within claim 13,  and claim 15 therefore fails to further limit claim 13.

Dkt. 64-2 at p. 35. As before, CosMX has not provided any expert testimony to explain how, from a POSITA's perspective, such a term should be viewed as indefinite.

If ATL's request for correction is granted, ATL believes that would overrule any claim of indefiniteness. Should CosMX raise additional disputes in its responsive brief, ATL reserves all

rights to respond. For the reasons above, ATL proposes that the disputed term is definite and should be awarded its plain and ordinary meaning with the judicial correction applied.

### D. "the pores at least comprises a part of the inorganic particles" (Patent '148: Claims 1, 10)

| **ATL:** Plain and ordinary meaning with the correction of "comprises" to "comprise." | **CosMX:** indefinite |
|---|---|

ATL's position that this limitation provides sufficient support for a POSITA to understand the plain and ordinary meaning of the term, with the limited correction of changing the singular form of the verb "comprises" to "comprise," is well supported from both an intrinsic evidence perspective and from the perspective of a POSITA. As stated above, the standard for judicial correction of a claim is that a district court can "act to correct an error in a patent by interpretation of a patent where no certification of correction has been issued ... only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Maxell Ltd. v. Huawei Device USA Inc.*, 297 F. Supp. 3d 668, 689 (E.D. Tex. 2018). Here, ATL's request for correction is straightforward and not subject to reasonable debate considering the claim language and specification: the term at issue has been in the '148 patent since the filing of the original application, and there was a clear grammatical error as presented in the claim as the singular verb "comprises" refers to the plural noun "the pores." As such, the proper correction would be to modify the plurality of the verb so that it is presented in its plural form (*i.e.,* "comprise") to match the plurality of the noun. This change would not have any substantive change on the scope or meaning of the claim and is consistent with the remainder of the specification, as Dr. Horn opines. *See* Ex. E at ¶ 52.

Once again, CosMX alleges that this term is indefinite and yet has provided no clarity as to why it believes this to be so. CosMX's First Amended Invalidity Contentions merely provides boilerplate, conclusory language: "This claim is indefinite for failure to satisfy the definiteness requirement of 35 U.S.C. § 112(b). When read in light of the other claim language, specification, and the prosecution history, this claim language fails to inform a POSITA with a reasonable certainty of what would constitute 'the pores at least comprises a part of the inorganic particles.'" Dkt. 64-2 at p. 35.  CosMX, however, has provided no evidence from the perspective of a POSITA as to why the '148 patent's specification and claims fail to provide the requisite guidance. CosMX's objection to ATL's judicial correction should be overruled, and its claim of indefiniteness should be denied.

Based on the plain language of claims 1 and 10 of the '148 patent, CosMX cannot meet its clear and convincing evidentiary burden to prove this limitation is indefinite. A POSITA would understand the '148 patent to disclose two distinct requirements as to what defines a pore in the context of the patent. First, the relevant language states that the "porous film comprises pores formed by the binder", meaning that the "outer perimeter of the pore's geometry (*i.e.*, the shape and boundaries of the pore wall, *but not the pore itself*) is defined by the binder itself." '148 Patent at claims 1 and 10; *see also* Ex. E at ¶ 54. Second, the same claims disclose that the "pores at least comprise a part of the inorganic particles", meaning that part of the inorganic particles must be inside the empty space of the pore. *Id.*

This understanding is consistent with the '148 patent's specification, which teaches how this porous film is formed:

> A method for preparing a porous film is provided, which is used for preparing the porous film according to the first aspect of the present application, including steps of: (1) mixing inorganic particles with a binder, and then adding a first solvent and uniformly stirring the mixture to obtain a coating solution, wherein the binder is

dissolved in the first solvent; (2) uniformly coating the coating solution on at least one surface of a substrate to form a wet film; (3) immersing the substrate with the wet film into a coagulation solution for phase transformation, wherein the coagulation solution includes a second solvent and a third solvent, and the second solvent and the third solvent are miscible with each other; (4) performing a drying process after the phase transformation is completed, to obtain the substrate whose surface is provided with a porous film, wherein the average wall thickness between adjacent pores in the porous film is in a range of 20 nm to 500 nm, and the average pore size of the porous film is not less than 0.3 μm.

'148 Patent at 8:33-58. Based on this description, a POSITA would have understood that the porous film is made by first mixing the inorganic particles with a binder before dissolving the binder in a solvent. *Id.*; *see also* Ex. E at ¶ 56. This mixture of particles, binder, and solvent is then coated onto a substrate and the substrate + coating is submerged into what the specification calls a "coagulating solution." *Id.* While submerged in the coagulating solution, the binder begins to form a web-like film with pores throughout, with the outer geometry of each pore being defined by the binder (*i.e.,* "formed by the binder). *Id.* Furthermore, because the original binder solution comprised of both binder *and* inorganic particles, as the binder film precipitates (*i.e.,* solidifies) out of the dissolved solution, some particles may remain inside the binder while others naturally become exposed within the empty spaces of the pores. *Id.* When viewed through a microscope, an observer can see that some particles are visible within the space of the pores themselves. *Id.* at ¶¶57-58*; see also* '148 Patent at FIG. 2 (reproduced with annotations below).

18



The visible portions of the inorganic particles within the empty space of the pore itself are what the '148 patent describes when it states that the pores "at least comprise a part of the inorganic particles." This concept is further reinforced by the '148 patent's teachings regarding the comparative sizes of the thickness of the pore wall (*i.e.,* the thickness of the web-like binder) and the size of the particles. For instance, claim 3 of the '148 patent along with its specification teaches that the "average wall thickness between the pores is in a range of 20 nm to 500 nm," or 0.02 μm to 0.5 μm. *See* '148 Patent at claim 3; 25:49-51; 26:33-36. In contrast to this relatively thin thickness of the pore wall, the '148 patent further states that the particle sizes are much bigger. For instance, claim 1 of the '148 patent states that the Dv10 value of the inorganic particles (defined as the size distribution in which 10% of the particles in a particular porous film would be below this specific diameter) should be in the range of 0.015 μm to 3 μm, meaning that 90% of the particles would be above this diameter and therefore much larger than the 0.02 μm to 0.5 μm binder walls. In addition, Example 3 of Tables 1 and 2 (which corresponds to Figure 2 of the '148 patent) discloses that the Dv10 particle size was 0.9 μm (*see* '148 Patent at Table 1, Example 3)

19

whereas the pore wall thickness was only 0.18 μm (Table 2, Example 3), again demonstrating that the particles are far larger than the thickness of the pore wall/binder. And, as described above, these particles are naturally exposed during the manufacturing process when the binder precipitates out of the coagulating solution. Based on these disclosures, a POSITA would logically expect these much larger particles to stick out of the thinner walls and into the exposed space of the pores. Indeed, CosMX in its IPR petition challenging the '148 Patent held the same understanding in its discussions for the alleged prior art. *See* Ex. G (Petition from *Zhuhai CosMX Battery Co. Ltd. v. Ningde Amperex Technology Ltd*., IPR2025-00432) at 26 (asserting that the alleged prior art met the disputed term because it disclosed "filler particles [that] extend into the pores," including "larger filler particles [that] must protrude into the pore spaces spaces—and/or themselves comprise a part of the pore walls—ensuring that the pores inherently contain portions of the inorganic filler material.").

For the reasons discussed above, CosMX's construction that this term is indefinite should be rejected and ATL's proposed construction of "plain and ordinary" meaning, alongside its request for the judicial correction of the word "comprises" should be adopted.

### E. "a first layer comprising a first material" ('118 Patent: Claims 1-4, 6-7, 10, 12-13, 15, 16, 19, 20)

| **ATL:** Plain and ordinary meaning | **CosMX:** "a first layer comprising a first active material" |
|---|---|

CosMX's proposed construction for the term "a first layer comprising a first material" improperly narrows the term to "a first layer comprising a first ***active*** material." The Court should reject CosMX's attempt to inject the extraneous limitation "active" into the term because nothing in the claims, specification, or prosecution history compels departing from the term's plain meaning. "There are only two exceptions to the general rule that claim terms are construed

according to their plain and ordinary meaning: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Estech Systems IP, LLC v. Carvana LLC*, No. 2:21-cv-00482-JRG-RSP, 2023 WL 3681720, at *4 (E.D. Tex. Jan. 27, 2023) (internal quotations and alterations omitted) (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). Neither exception applies here.

First, "[t]o act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Id.* (internal quotations omitted); *Estech Systems*, 2023 WL 3681720, at *4 (same). Descriptions of a "preferred embodiment" do not count as a "clear lexicographic definition." *E-pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003); *see also Peer Communications Corp. v. Skype Technologies SA*, No. 6:06-cv-00370, 2008 WL 4831001, at *4-5 (E.D. Tex. May 29, 2008) (finding provisional application's statement as to what a "registry" is under a section titled "definition of registry" was not definitional of term more broadly used in the patent) (citing *E-pass*, 343 F.3d at 1369). In *E-pass*, the claims recited "an electronic multifunction *card*" that served as a substitute for multiple credit cards. 343 F.3d at 1365-66 (Fed. Cir. 2003). The specification recited the word "card" over 280 times in reference to, *inter alia*, "single-purpose cards" (*i.e.*, credit cards), and stated that "the electronic multi-function card [] *has the outer dimensions of usual credit or check cards*." *Id.* Despite these disclosures, the Federal Circuit reversed the district court's construction limiting the term to a card having the size of a standard credit card and held that patentee's statements merely described a *preferred embodiment*—they were not an intended to *define* the claimed "card." *Id.* at 1369-71. To arrive at this conclusion, the court relied on statements in the specification that suggested that credit cards may deviate from their usual dimensions. *Id.* at 1369-70.

21

As in *E-pass*, the specification here describes in detail a preferred embodiment where the claimed first layer contains an active material. *See* '118, 3:66-4:3 ("FIG. 2 shows a double-layered active material layer structure…, i.e., an additional active material layer 3 is formed between the active material layer 2 and the positive electrode collector 1."), 4:32-5:18 (similar), 8:26-14:17 and Table 1 (providing 50 examples and related test results). However, like *E-pass*, these disclosures all relate to the preferred embodiment; they do not "clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365; *Estech*, 2023 WL 3681720, at *4 (same). The '118 patent makes this clear because it discloses that the claimed first layer, in its broadest form, is simply "***a coating with a higher resistivity*** [] provided on the surface of the positive electrode current collector to avoid direct contact between the negative electrode active material layer and the positive electrode current collector so as to prevent the most dangerous short circuit mode from occurring." '118, 3:21-30; *see also id.*, 3:50-54. There is no requirement that this higher resistivity coating comprise an active material. Instead, the active material-containing examples merely relate to the preferred embodiment.

CosMX's proposed construction limiting "first material" to an active material also improperly reads out express embodiments disclosed in the specification. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-1277 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification."); *see also CDN Innovations, LLC v. Grande Communications Network, LLC*, 2021 WL 3615908, at *32 (E.D. Tex. Aug. 13, 2021) (rejecting construction that "improperly inserts the term '***active***' into the claim" because the specification provided an embodiment that was not active) (citing *Oatey Co.*, 514 F.3d at 1276). The '118 patent discloses that the first layer may include binders and conductive agents. '118, 6:28-53. Hence, as two non-limiting examples, the claimed "first material" in the "first layer" is not

required to be an active material but may instead be a binder or a conductive agent. But even if the specification only described active materials as examples of the claimed "first material" (it does not), that alone does not justify importing an "active" material requirement into the claims. *Cadence Pharmaceuticals Inc. v. Exela Pharmsci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) ("[E]ven if all of the embodiments discussed in the patent included a specific limitation, it would not be proper to import from the patent's written descriptions limitations that are not found in the claims themselves."); *Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification; we do not redefine words."); *Estech Systems*, 2023 WL 3681720, at *4 (same).

Second, prosecution history disclaimer "requires that the alleged disavowing … statements made during prosecution be both clear and unmistakable." *Avid Technology, Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016); *Estech Systems*, 2023 WL 3681720, at *4. It is undisputed that patentee did not make any statement that disavowed claim scope during prosecution of the *application* that led to the '118 patent. Instead, CosMX alleges that statements made during the '118 patent's IPR constitute disclaimer. Dkt. No. 82-2, 11. Specifically, CosMX cites to the "Background" sections of ATL's Discretionary Denial Brief and Patent Owner Preliminary Response, where ATL stated:

> The '118 Patent describes a two-layer electrode to improve safety when the cell is punctured. *See* Ex. 1001, 2:60-64. A first layer, which is positioned closest to the current collector of the electrode, comprises active material particles having a small size to promote adhesion of the active material to the current collector. *See id.*, 3:50-57; 4:55-62.

Ex. H (Patent Owner's Discretionary Denial Briefing) at 10-11; Ex. I (Patent Owner's Preliminary Response) at 5.

The passage above appears in a "Background" section where ATL provided a short summary of select aspects of the '118 patent to familiarize the reader with the '118 patent ahead of arguments that follow later in the body of the briefs. To that end, ATL described (not surprisingly) the '118 patent's *preferred embodiment*: a first layer positioned closest to the electrode's current collector that comprises active material particles having a small size to promote adhesion to the current collector. Such a statement, especially given the context, does not clearly and unmistakably disavow the scope of the claimed "first layer comprising a first material" to only include an active material.

First, the statement does not state that the first layer *must* comprise active material particles. Second, a POSITA would understand that the statement—as part of the "Background" section— is meant to provide a short summary of aspects of the '118 patent, not serve as a stand-in for the entire '118 patent specification. This, coupled with the passage's citations to the '118 patent's specification describing the preferring embodiment, make clear that the patentee was merely restating that preferred embodiment to the reader. Third, the statement does not distinguish prior art cited in the IPR, which would be more consistent with clear disavowal. Finally, even if ATL's statement was ambiguous (it is not) or if CosMX's interpretation of the statement as limiting the scope of the term were *one* reasonable interpretation (it is not) among others, that alone would not be enough to satisfy the "high" bar for disclaimer. *Avid Tech.*, 812 F.3d at 1045 ("Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer.") (internal quotations and citations omitted); *Estech Systems*, 2023 WL 3681720, at *4 ("Where an applicant's statements are amendable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable.") (quoting *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013)).

Moreover, that "the same terms in the same patent or ***related patents*** are presumed to carry the same meaning" counsels against CosMX's construction. *Spreadsheet Automation Corp. v. Microsoft Corp.*, No. 2:05-cv-00127-DF, 2006 WL 6143063, at *3 (E.D. Tex. Nov. 9, 2006) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003)); *NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1293 (Fed.Cir. 2005) (where patents "derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents"). Here, patents related to the '118 patent include claims that expressly recite, "a first ***active material*** layer comprising a first ***active*** material." *See* Ex. J (U.S. Patent No. 11,322,774, uncle to the '118 patent) at cl. 1; Ex. K (U.S. Patent No. 11,322,774, parent to the '118 patent) at cl. 1.

But unlike the related patents' claims, the '118 patent's claims drop the "active" qualifier and broadly recite "a first layer comprising a first material." Hence, the patentee intentionally chose to not limit the claimed "first layer" to necessarily include an active material. If "first material" means "first *active* material," as CosMX proposes, including the word "active" in the term "first active material" in the related patents' claims would be superfluous. *See AstraZeneca AB v. Mylan Pharmaceuticals, Inc.*, No. 1:22-cv-35, 2022 WL 17178691, at *7 (N.D. W.Va. Nov. 23, 2022) (declining to import a stability requirement into "pharmaceutical composition" in the patent-in-suit because a related patent's claims already expressly recited a "*stable* pharmaceutical composition," which would render the term "stable" in those claims "superfluous"); *see also Heron Therapeutics, Inc. v. Azurity Pharm. Inc.*, No. 24-1363 (WCB), 2025 WL 3022166, at *1 (D. Del. Oct. 29, 2025) (Bryson, C.J., *sitting by designation*) (relying on the doctrine of claim differentiation between related patents to conclude that "[t]he presence of an express reference to physical stability in some of the patents and the absence of such a reference in others gives rise to

an inference that the claims lacking a reference to physical stability do not require it."). Hence, the Court should not limit "a first layer comprising a first material" to include an active material so that the term is construed consistently across all patents in the '118 patent family.

CosMX's construction should also be rejected because dependent claim 7 narrows the claimed "first material" to comprise one or more listed active materials. This suggests, through the doctrine of claim differentiation, that claim 1 does not require the "first material" to include an active material. While CosMX may counter that dependent claim 7 instead narrows the allegedly required active material in claim 1 to *specific* active material compositions, at bottom dependent claim 7 shows that the patentee knew how to expressly limit the claims to include active materials but chose not to do so in claim 1. Similarly, the specification recites "first active material layer" and "first active material," *see, e.g.*, '118, 1:50-2:15, 3:66-4:17, again demonstrating that patentee knew how to limit claim 1 accordingly but did not do so.

Accordingly, the Court should construe this term according to its plain meaning.

### F. "a second layer comprising a second material" ('118 Patent: Claims 1, 3, 6, 8, 10, 12, 15, 17, 19, 20)

| **ATL:** Plain and ordinary meaning | **CosMX:** "a second layer comprising a second active material" |
|---|---|

Similarly, CosMX seeks to improperly limit the term "a second layer comprising a second material" to include an "active material." Many of the same arguments made above equally apply here and are incorporated by reference. *See supra*, Section III.E. In particular, the specification's descriptions and examples concerning a "second active material layer" containing an active material refer to a preferred embodiment; they are not definitional of the term. *See, e.g.*, '118, 3:66-4:17, 4:40-5:18, 8:28-14:17, Table 1. The specification also describes how the second layer may include materials other than active material, including binders and conductive agents. *Id.*, 6:46-53, 8:34-40. Moreover, the '118 related patents include claims that expressly recite, "a second ***active***

*material* layer comprising a second *active* material," *see* Ex. J at cl. 1; Ex. K at cl. 1, indicating that the patentee intentionally chose to not limit the claimed "second layer" to necessarily include an active material. If "second material" means "second *active* material," as CosMX proposes, including the word "active" in the term "second active material" in the related patents' claims would be superfluous. Dependent claim 8 also narrows the claimed "second material" to comprise one or more listed active materials, which suggests that "second material" in claim 1 should not be limited to an active material. Finally, CosMX's prosecution history disclaimer argument is even weaker here for this term, as there is no equivalent statement made concerning the "second layer" in the IPR as that discussed above concerning the "first layer." *See supra* Section III.E. Accordingly, the Court should construe this term according to its plain meaning.

<u>**CONCLUSION**</u>

ATL respectfully requests that the Court adopt its positions because they are supported by the intrinsic and extrinsic evidence as well as the principles of claim construction.

DATED: December 2, 2025

/s/ *Michael D. Powell*_____
Michael D. Powell
California State Bar No. 202850
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
mikepowell@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Lance Yang
California State Bar No. 260705
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
lanceyang@quinnemanuel.com

865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Phone: (213) 443-3000
Fax: (213) 443-3100

G. Blake Thompson
State Bar No. 24042033
blake@TheMannFirm.com
MANN | TINDEL | THOMPSON
112 E. Line Street, Suite 304
Tyler, Texas 75702
Telephone: (903) 657-8540
Facsimile: (903) 657-6003

*Attorneys for Plaintiff Ningde Amperex Technology Limited*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served on December 2, 2025,with a copy of this document via the Court's electronic CM/ECF system.

December 2, 2025                    /s/ *Yunzhi Leon Lin*
                                   Yunzhi Leon Lin